NOV 18 2022 pv2:40
FILED-USDC-CT Hartford

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

3:20-cv-01733 -AVC

KENNY R HOLLEY JR

Inmate #337307

     Plaintiff

v.

SCOTT SEMPLE, Commissioner of Corrections

JAMES DZURENDA, former Commissioner of Correction

LEO ARNON, former Commissions of Correction

THERESA LANTZ, former Commissioner of Correction

JAMES ARMSTRONG, former Commissioner of Correction

LAWRENCE MEACHUM, former Commissioner of Correction

HENRY FALCON, Warden, Garner Correctional Institution

STEVEN LINK, Director, Department of Correction Engineering and Facilities Management.

DAVID BATTEN, former Director, Department of Correction Engineering and Facilities Management

John Does 1-3, all in their individual and office capacities

     Defendants

NOVEMBER 12, 2022

## COMPLAINT

### Introduction

1.  This action is filed on behalf of Kenny Holley inmate, pre-trial detainee, exposed to levels of indoor radon gas far in excess of Federal Environmental Protection Agency (EPA) and World Health Organization (WHO) standards while incarcerated forcing inmates to be exposed involuntarily to indoor radon gas, a recognized human carcinogen far in excess of any published safe level for more than twenty years constituted deliberate indifference by correctional officials to conditions of confinement posing an unreasonable risk of serious damage to an inmate's health in violation of their rights under the

United States and Connecticut constitutions.

2.  When radon gas is inhaled, densely ionizing alpha particles emitted by deposited short-lived decay products of radon (218Po and 214Po) can interact with biological tissue in the lungs leading to DNA damage. Cancer is generally thought to require the occurrence of at least one mutation, and proliferation of intermediate cells that have sustained some degree of DNA damage can greatly increase the pool of cells available for the development of cancer

3.  In Helling v. McKinney, the Supreme Court held that the Eighth Amendment protects prisoners from official's deliberate indifference to conditions posing an unreasonable risk of serious damage to the prisoner's future health. 509 U.S. 25, 33-35 (1993). At issue in Helling was an inmate's exposure to environmental tobacco smoke in the absence of a present physical injury. The Supreme Court held an inmate must show he was "exposed to unreasonably high levels" of environmental toxins. Id at 35. To violate the Eighth Amendment, the inmate must show the risk he complains of is one that "society considers . . . so grave that it violates contemporary standards of decency to expose anyone unwilling to such risk." Helling, 509 U.S. at 36. ("In other words, the prisoner must show that the risk of which he complains is not one that today's Society chooses to tolerate.")

4.  Cognizant of the health hazards of environmental tobacco smoke, the Connecticut Department of Corrections imposed a no-smoking policy at Garner Correctional Institution when It opened in November 1992 to ensure and promote the health of inmates and staff alike.

5.  Indoor exposure to radon is recognized as the leading cause of lung cancer among non-smokers followed by exposure to environmental tobacco smoke and thus constitutes a risk that today's society chooses not to tolerate.

6.  Like exposure to asbestos, any causally related medical condition may take many years to Manifest itself.

7.  Connecticut Department of Corrections permitted its employees at Garner to file a workers' compensations claim for exposure to high levels of indoor radon gas, without any limitations on length of exposure, thus accepting liability to its employees for the health risk imposed by a third of the daily indoor radon exposure over a fixe day work week as compared

to inmates housed at this facility 24 hours a day, 7 days a week.

("if you have any questions or concerns surrounding this process, a complete report of the Radon test results is available for review in the Administrative Office (room 104) of the Garner Correctional Institution. **You also have the ability to complete a WC207 package.** The following link to the DPH website provides additional information about radon: http://www.ct.gov/dph/cwp/view.asp?a=3140&q=387592&dphNav  GID=1828&d[j{MavCtr=#47072

8.  The WC207 package consists in relevant part of the following:

**DAS Form 207 – First Report of Injury:** This form is used to record information when phoning In the claim to the TPA Injury Intake Center and reviewing the claim in CORE-CT by the human resources (HR) claim-processing unit. The supervisor must provide accurate information on the completed form and to the intake specialist, as it is the basis for the establishment of the claim in CORE-CT.

**DAS Form 207-1 – Incident Review Report:** This form is completed by the supervisor to Record information used for loss control purposes. Form 207-1 identifies the root causes of Injury to establish corrective action to reduce the potential for future injury.

9.  DAS Form 207 submitted by Garner correctional and medical staff identify the "type of Injury" and category or illness or injury as "exposure," DAS Forms 207-1 submitted describe The "type of incident" as "Exposure: High levels of radon "and the "chain of events" as "High levels of radon detected by CT Department of Public Health."

10. Additionally, given their exposure over time to indoor radon levels that greatly exceeded EPA action levels, Garner correctional and medical staff were advised to obtain a baseline Chest x-ray or CAT scan at his or her physicians' determination based on medical history, which Is the standard of medical care for those individuals exposed to high levels of radon gas. Because medical conditions causally linked to radon including lung cancer can take many years To manifest themselves, Garner correctional and medical staff were further advised thereafter to Include such medical monitoring as part of the annual physicals.

11. Plaintiff seeks declaratory and injunctive relief; plaintiff additionally seeks compensatory relief.

3

## Jurisdiction and Venue

12. This court has jurisdiction pursuant to 28 U.S.C 1331 and 1343, 42 U.S.C 1983 and 1988, As well as the Eighth Amendment and Fourteenth Amendments to the United States Constitution. The court has supplemental jurisdiction under the state law claims pursuant to 28 U.S.C 1367a.

13. Venue in this Court is proper pursuant to 28 U.S.C. 1391. This Court is authorized to grant Injunctive relief under 18 U.S.C 3626.

## Parties

14. Plaintiff is an inmate exposed to indoor radon gas while incarcerated at the Garner Correctional Institution, Connecticut Department of Correction, and who was thus subject to Conditions of confinement that violated his rights under U.S. Constitution as well as the Connecticut Constitution.

15. Plaintiff was incarcerated at Garner Correctional beginning in 2009 until 2011: he is presently incarcerated in a different state correctional facility.

16. Defendant Scott Semple has served as the Commissioner of Connecticut's Department of Correction since August 22014: from mid-2009 through November 26, 2013, defendant Semple Was Warden at Garner Correctional Institution after which time he was promoted to Deputy Commissioner for Operations prior to being named to head the Department of Correction.

17. Defendant James Dzurenda served as Warden at Garner from 2005 to 2009, Deputy Commissioner for Operations from July 2010 to April of 2013 when he became Commissioner of Connecticut's Department of Correction through August 2014.

18. Defendant Leo Arnone was the Commissioner of Connecticut's Department of Correction From 2010 to 2013.

19. Defendant Theresa Lantz was the Commissioner of Connecticut's Department of Corrections from 2010 to 2013.

20. Defendant James Armstrong was the Commission of Connecticut's Department o Corrections from 1995 to 2003.

21. Defendant Lawrence Meachum was the Commissioner of Connecticut's Department of

Corrections from 1987 to 1995.

22. Connecticut's Department of Correction is administered by the Commissioner of Correction who shall be responsible for the overall management and direction of the Department And shall ensure that the Department's statutory duties are carried out.

23. John Does 1 to 3 were in charge of the construction project for Garner and/or the Engineering and building safety since its construction.

24. Defendant Henry Falcone has been the Warden at Garner since March 7, 2014; Defendant Falcone became a captain when he was first assigned to Garner in 2006; he thereafter Was promoted to Deputy Warden at Garner in 2011.

25. In accordance with Connecticut Department of Correction policy, while Wardens at Garner, Defendants Semple, Dzurenda and Falcone were responsible for the operations of that Facility on a 24-hour basis, seven (7) days a week.

26. Defendant Steven Link is the Director Department of Correction Engineering and Facilities Management for the Connecticut Department of Correction.

27. The Department of Correction Engineering and Facilities Management is responsible to Provide centralized direction and technical assistance throughout the agency to include: Management of the capital budget and plan; project design, approval and management; facility Preventative maintenance; and repair. In addition, this unit also coordinates compliance with OSHA standards and environmental guidelines.

28. Defendant David Batten was the former Director, Department of Corrections Engineering And Facilities Management during times that inmates were exposed to radon.

29. At all relevant times herein, Defendants were acting in the performance of their duties And within the scope of their employment by Connecticut Department of Correction, and under Color of state law. They are being sued in their official and individual capacities.

**Allegations**

30. Plaintiff brings this action as a detainee, housed at Garner Correctional Institution exposed Over a long period to high levels of indoor radon as revealed by the December 2013 and January 204 testing results demonstrating levels in excess of the EPA action level of 4.0 piC/L.

5

31. The levels found at Garner were double, triple and even more than five times the EPA Action level-meaning that inmates were exposed daily to the equivalent of smoking up to 2 ½ Packs a cigarette a day.

32. Plaintiff challenge that exposure to indoor radon gas, a known carcinogen, subjected him to Conditions of confinement that violated his rights under the U.S. Constitution as well as the Connecticut Constitution.

33. Plaintiff propose a Declaratory/Injunctive and Damages.

34. The Declaratory as a pre-trial detainee, housed at Garner Correctional Institution any time within the following parameter: from the date of its opening in November 1992 at least through the emergency installation of the radon mitigation system completed on October 10, 2014. this suit may go beyond the installation of a remediation system as the remediation system was only designed to mitigate those areas tested that revealed indoor radon gas in excess of the EPA standard. The mitigation system installed thus intentionally did not remedy any excessive indoor radon gas where inmates were housed. Radon testing in those areas that house inmates must be conducted to ensure the indoor radon gas levels in those areas are below the EPA action level pursuant to requisite testing protocols. If the levels are found to be above the EPA action level then further mitigation systems must be installed to ensure that inmates are not Exposed by their living conditions to unsafe, toxic housing conditions.

This plaintiff will require periodic medical monitoring to determine the impact of the radon exposure.

The Declaratory/Injunctive seeks relief based on substantial allegation of wrongful conduct by the state and its officers named as defendants herein in his or her official and individual capacities to promote an illegal and unconstitutional purpose in excess of the officer's statutory authority.

The Declaratory/Injunctive also seeks relief based on substantial claim that the state and its officers named as defendants herein in his or her official and individual capacities violated the constitutional rights of the subject with respect to conditions of confinement that exposed him to high levels of a known carcinogen, with the reckless and intentional omission by them for failing to test for indoor radon gas those areas that house

inmates, and by failing affirmatively to provide them with the recommended standard of medical monitoring for a person exposed to high levels of indoor radon gas.

(B)    Damages if diagnosed in the future with any medical conditions conclusively linked to being exposed to levels of radon in excess of the EPA standard, at this time medical conditions include lung cancer and chronic, nonmalignant lung diseases such as chronic obstructive pulmonary disease (COPD), emphysema, chronic interstitial pneumonia and pulmonary fibrosis.

Compensatory damages are also sought against defendants Semple, Dzurenda and Falcone In their individual capacity for recklessly, willfully and intentionally depriving plaintiffs of access to the court system to complain about the conditions of their prison with respect to their involuntary exposure to high levels of a known carcinogen over a long period of time.

**A.    Numerosity: Fed. R. Civ. P. 23(a)(1)**

The stated capacity at Garner, bases on its design, is 520 inmates: at various times since Its opening, when Connecticut has experienced an overall adult male inmate population in excess of the officially established capacities of its correctional facilities, Garner has housed up to one hundred inmates over its capacity by utilizing its gymnasium as a dormitory. The gymnasium tested more than twice the acceptable EPA level of indoor radon gas.

34.    In addition, the inmate population at Garner in any given year is not static, with inmates Routinely being released or transferred to other correctional facilities.  The time parameters for this Action run from November 1992 at least through October 2014 when the mitigation system was Installed, a period just shy of twenty-two (22) years.

35.    Because the mitigation system may be inadequate for the entire facility as to was designed only to address the problems areas of radon that had been tested, thus intentionally excluding those areas where the inmates are housed, discovery may reveal that inmates are still being exposed to indoor radon gas in excess of acceptable limits.

**B.    Commonality: Fed R. Civ P. 23(a)(2)**

36.    The relief sought is common to all members of a class action suite, and common questions of law and fact exist as to all members of the class. Post-conviction inmates contend that their conditions of confinement constituted cruel and unusual punishment under the Eight Amendment

to the United States Constitution and Connecticut Constitution, Article First, Section 8 and pre-trial detainees contend their right to be free from deprivations of liberty without due process of law in violation pursuant to the Fourteenth Amendment to the United States Constitution and Connecticut Constitution, Article First, Section 8.  As a matter of proof, however, the due process clause of the Fourteenth Amendment to the United States Constitution provides to pre-trial detainees at least equal protection to that accorded convicted prisoners under the Eighth Amendment to the United States Constitution. The state constitutional claims follow these same parameters.

37.     Plaintiff further contend that defendants Semple, Dzurenda and Falcone in their individual capacities recklessly, willfully and intentionally deprived plaintiffs of access to the court system, In violation of their statutory, state and federal constitutional obligations, to complain about the conditions of their prison with respect to their involuntary exposure to high levels of a known carcinogen over a long period of time by failing to test for radon in those areas where inmates were housed and by failing to provide notice to the plaintiff class that they had been exposed to high levels of radon over time so that the plaintiff class could exercise their administrative remedies and seek relief from the Claims Commissioner by meeting this condition precedent.

### C.  Typicality: Fed. R. Civ. P. 23(a)(3)

The plaintiff claims are typical of the claims of the members of a class action, and has the same interests as all other members of a class action. The answer to whether the acts and omissions by Defendants are unconstitutional as a matter of federal and state law will determine the claims of the plaintiff.

### D.  Fed R. Civ. P. 23(b)(2)

When radon gas is inhaled, densely ionizing alpha particles emitted by deposited short-lived decay products of radon can interact with biological tissue in the lungs leading to DNA Damage.

### E.  Fed. R. Civ. P. 23(3)

The injunctive relief sought, annual medical monitoring with further follow up as dictated by results

8

Exhaustion of Administrative Remedies: Willful Obstruction of the state and constitutional Rights for inmates to have open access to courts

38.     At no time did Defendants Semple, Dzurenda and Falcone provide plaintiff with notice that high levels of indoor radon gas had been found in 2012, well before disclosure by them of the testing that occurred in late 2013 and early 2014.

39.     At no time did Defendants Semple, Dzurenda and Falcone provide plaintiff with notice That test results from December 2013 and January 2014 revealed high levels of indoor radon gas.

40.     At no time did Defendants Semple, Dzurenda and Falcon provide plaintiff, with the Information provided thereafter to Garner's correction officers, administrative staff and medical unit that the radon testing results necessitated an emergency capital expenditure for the installation of a radon mitigation system (2) information on the risks associated with indoor radon exposure and the determination that quarantining the medical block was not mandated even though the radon results in various rooms were the equivalent of being exposure to more than two packs of cigarette smoke per day; and (3) the availability of filing a workers' compensation claim, including written documentation that mass filing of workers' compensation claims for all Garner correctional staff and medical care unit was under consideration by the carrier.

41.     By recklessly, intentionally and willfully depriving the plaintiff of notice as to the indoor Radon testing results and installation thereafter of a radon mitigation system, Defendants Semple, Dzurenda and Falcone exceeded their statutory authority and state (Connecticut Constitution, Article First, second 10) and federal constitutional obligations to provide open access to courts by Depriving plaintiff of the condition precedent to court access: the opportunity to file a timely Grievance and thereafter exhaust their administrative remedies.

42.     The policy set forth in Connecticut Department of Correction Administrative Directive 9.6, entitled Inmate Administrative Remedies, effective as of August 13, 2013, states at Paragraph (1) : "The Department of Correction shall provide a means for an inmate to seek formal review of an issue relating to any aspect of an inmate's confinement that is subject to the commissioner's Authority. The Inmate Administrative Remedies Process enables the department

to identify individual and systemic problems, to resolve legitimate complaints in a timely manner and to facilitate the accomplishment of its mission".


43.    By intentionally and willfully depriving the plaintiff of notice as to the indoor radon testing results and installation thereafter of a radon mitigation system as well as the significant health risk associated with exposure to this known human carcinogen, Defendants Semple, Dzurenda and Falcone exhibited an illegal bias at the highest administrative levels of both Garner Correctional Institution and the Department of Correction against plaintiff as to the issue of the involuntary Inmate exposure to indoor radon gas, a known carcinogen, well in excess of the EPA standard.

44.    Said demonstrable and illegal bias by Defendants Semple, Dzurenda and Falcone Recklessly, intentionally and willfully violated the stated policy of the Inmate Administrative Procedures, thus rendering the inmate grievance procedures inadequate both as a matter of fact and law such that plaintiff failure to exhaust his administrative remedies is excusable as

    (1) The administrative remedies were not available to plaintiff; and (2) Defendants Semple, Dzurenda and Falcone have acted in such way as to stop them from raising failure to Exhaust as a defense.

45.    Defendants Semple, Dzurenda and Falcone's acts and omissions-recklessly, intentionally and willfully depriving the plaintiff of notice as to the indoor radon testing results and installation thereafter of a radon mitigation system and the significant health risk from exposure to this known carcinogen-constituted a predetermination of the outcome of any inmate grievance on radon, rendering the inmate grievance procedures futile as a matter of law and fact. Moreover, damage done by the excessive levels of radon is now presumptively concluded, and there is nothing that correctional staff can do to remediate the problem unless compelled to by the courts.

46.    Because plaintiff was unable to exhaust their administrative remedies, they could not comply with the procedures set forth in Connecticut Public Act 16-127 23 to file for damages with the Claims Commissioner, as exhaustion of the administrative remedies is a condition precedent.

47.    By recklessly, intentionally and willfully depriving the plaintiff of notice as to the indoor radon testing results and installation thereafter of a radon mitigation system, Defendants Semple,

10

Dzurenda and Falcone exceeded their statutory authority as well as their state and federal constitutional obligations to provide open access to the courts by depriving the plaintiff of the condition precedent to court access: the opportunity to file a timely grievance, thereafter exhaust their administrative remedies, and file a claim for injury with Claims Commissioner pursuant to Public Act 16-127 & 23.

48.     Moreover, the Connecticut Department of Correction denied a putative class member who, At that relevant time, was housed at MacDougall Correctional Institution, access to particular pages of Prison Legal News on the basis that such pages jeopardize a valid penological interest on the basis of "Safety and Security." Those pages discussed an inmate class action for radon exposure at Garner. This putative class member appealed, claiming that the Department of Correction removed and censored this article as part of its ongoing effort to cover up what took place at Garner and to keep prisoners who were housed at Garner ignorant of the potential medical risks Caused by exposure to high levels of radon.  Although the putative class member was ultimately successful in obtaining these censored pages, the fact that he was housed at MacDougall and thus, had no ready access to spread this information to inmates housed at Garner is of legal and factual significance of the extent to which Defendant Semple violated his statutory and constitutional obligations to provide open access to the courts.


## Statement of Facts

### Radon: a known human carcinogen

48.     Radon is radioactive gas that comes from the natural decay of uranium that is found in Nearly all soils as well as rock and water.

49.     Because radon is a noble gas, it is tasteless, odorless, colorless and imperceptible to the senses.

50.     In sharp contrast to an inmate's active and conscious perception of exposure to the toxicity of Environmental tobacco smoke (ETS or secondhand smoke) through his visual and olfactory senses, Plaintiff could not personally confirm his exposure to radon by virtue of their incarceration at Garner, With its closed ventilation system that trapped any radon leaked from the soil inside.

51.     Plaintiff was entirely dependent on Defendants affirmatively to disclose that inmates at Garner experienced indoor radon exposure daily over prolonged periods of time,

11

Except for that limited time during which plaintiff was permitted outdoors for recreation or other authorized purposes.

52.    Radon is a source of ionizing radiation and a proven carcinogen; radon is the leading Environmental cause of cancer mortality in the United States.

53.    Soil gas infiltration is recognized as the most important source of residential radon; the Primary health risk of radon in well water is from the inhalation of radon released indoors.

54.    Once radon has diffused into a building, further disintegration produces radon progeny (daughters) that tend to be electronically charged and tend to attract to dust particles that are Thereafter inhaled into the lungs where they further decay.

55.    Garner was well known, particularly in those areas that housed inmates, to have a Significant problem with dust particles in the area, which were very visible to the naked eye.

56.    Radon progeny are the major source of human exposure to alpha radiation that may Directly or indirectly damage DNA and other cell components, resulting in radon-induced lung Diseased or cancer.

57.    Alpha particles, which can only penetrate a short distance into bronchial epithelium, induce more biological damage that beta or gamma radiation, and can induce DNA base Mutations and chromosomal strand breaks.

58.    The substantive health risks associated with indoor radon exposure are underscored by The fact that in 1988, when the Connecticut Department of Correction, under the leadership of Defendant Meachum and Defendant Does 1 to 3, was in the planning phases of constructing Garner, Congress added Title III on indoor Radon Abatement to the Toxic Substances Control Act.

59.    That same year, in which Garner was still in the planning phases, the Surgeon General of The United States warned that radon is the second leasing cause of lung cancer in the United States And the leading cause of lung cancer in individuals who never smoked.

60.    According to the World Health Organization, lung cancer risk rises sixteen percent (16%) With every 2.7 pCi/L increase in radon exposure.

61.    All major US health organization, such as the Centers for Disease Control and Prevention. the American Lung Association and the American Medical Association, concur with estimates that radon causes thousands of preventable lung cancer deaths each year.

12

62.      The absolute numbers of radon-induced lung cancers are much larger in people who
Smoke or who have smoked in the past, due to a synergistic effect between radon and smoking.

63.      In January 2005, the Surgeon General, after reaffirming earlier warnings that breathing
Indoor radon gas over prolonged periods present a significant health risk, noted in a public release
That **"It's important to know that this threat is completely preventable**. Radon can be detected
With a simple test and fixed through well-established venting techniques.

**Garner Correctional Institution**

64.      After Congress added radon to the list of toxic substances in 1988, the public policy
Concerns that caused the U.S. Environmental Protection Agency and other local and state public
Health organization and nonprofits to advocate testing for radon gas in the home grew from an
Acknowledgment that individuals spent the most time indoors (70%) in their residential setting.

65.      For inmates of a correctional facility, such as the plaintiff, Garner Correctional Institution
Is their home; their residential setting 100% of the time.

66.      In 1988, when Congress added radon to the list of toxic substances, Connecticut Department
of Correction, under the leadership of Defendant Meachum, announced that it planned to build a
400-bed jail on the 700-acre grounds of the state-owned Fairfield Hills psychiatric hospital,
south of the center of Newtown, despite active town opposition.

67.      Garner Correctional Institution, a level 4 high security facility that houses adult males, is
Located at 50 Nunnawauk Road in Newtown, Connecticut; it opened on November 17, 1992.

68.      Defendant Meachum, after consideration of the input provided by the then Director,
Department of Engineering and Facilities Management and Defendant Doe(s) 1 to 3, decided to
Construct Garner Correctional Institution on land that had once been the waste site for the state
Mental health facility located at Fairfield Hills Hospital in Newtown, Connecticut, making the foundation
More vulnerable to cracking, and thus increasing the avenues for radon gas to seep into the facility.

69.      According to the federal Environmental Protection Agency and the U.S. Geological Survey
Which evaluated the radon potential in the United States and developed a Map of Radon Zones
to assist national, state and local organizations and building code officials in deciding whether
radon-resistant features should be applicable to new construction, Newtown Connecticut is located

13

in Zone 1 – Highest Potential (greater than 4.0 pCi/L), which designation reflects the average short-term radon measurement in a building without implementation of radon controls methods.

70.     Defendant Meachum, on behalf of the Connecticut Department of Corrections, and Defendants Doe(s) 1 to 3 thus decided to construct Garner in an area where indoor radon levels Would likely exceed the EPA action level of 4.0 pCi/L if no radon mitigation system were implemented.

71.     Radon resistance construction techniques are effective in preventing or minimizing radon entry.

72.     In the late 1980's and early 1990's, the Environmental Protection Agency's Office of Research and Development promulgated recommendations for radon prevention in the design and Construction of schools and other large buildings.  Because it is easier and much less expensive to design and construct a new building with radon-resistance and/or easy to mitigate.

73.     By failing to conduct indoor radon testing as it recommended after the completion of Construction before Garner opened its doors to house inmates in November 1992, Defendant Meachum and Defendant Doe(s) 1 to 3 missed another opportunity to install a radon mitigation System that would have prevented inmate exposure to the health risk associated with indoor radon.

74.     The original HVAC system was inadequate for the size of the Garner facility, and was later replaced; the original specifications for the HVAC system called for fresh air to be circulated 365 days a year, which is and was physically impossible in Newtown, Connecticut because of the cold weather in the late fall, winter and early spring; Garner maintenance employee thus never complied with the original specifications for the HVAC system. The failure to comply with the original HVAS specifications resulted in a higher incidence of trapping indoor radon at Garner.

75.     Higher radon levels are usually observed during the winter months when buildings are Sealed: because Garner Correctional Institution is a closed ventilation system with no capacity to Open windows to mitigate indoor radon levels, Plaintiff was exposed to high radon levels over all Four seasons.

76.     During each of their respective tenures, Defendants were afforded various opportunities To test for indoor radon at Garner and consequently to mitigate its harmful effects for inmates and Staff alike, triggered by the adoption of state/federal laws and/or regulations relating to radon Toxicity and/or highly publicized environmental concerns for high radon and/or uranium levels in the Water drawn from the Newtown underground aquifer from which Garner obtained its water supply

14

Water. On each such occasion, Defendants failed to test for indoor radon at Garner, thus missing
Earlier opportunities to mitigate this preventable health risk for inmates and staff alike many years
before the ultimate installation of a radon mitigation system in October 2014.


77.     Public Act 95-311, later codified as Connecticut General Statues & 20-327b, which went in to
Effect on January 1, 1996, provided that residential property sellers must provide a written
Residential condition report to a prospective buyer, which disclosure form adopted through
Regulations requires sellers to disclose any radon testing results.

78.     Because Garner is the residential setting for its inmates, the public policy underlying
Connecticut General Statues 20-327b provided such trigger which Defendants Meachum,
Armstrong, and Druzenda, in his then capacity as Warden at Garner, and Defendant Doe(s) 1 to 3, and
Thereafter other defendants who came into control subsequently, ignored to the detriment of the
Plaintiff.

79.     In the fall of 1996, the Department of Public Health's survey testing of well water across
Connecticut, including the Middle Gate School in Newtown, revealed high levels of radon in the water.
Because the Commissioner of the Department of Public Health initially refused to disclose the
Locations, despite and opinion from then State Attorney General Richard Blumenthal that the
Names of the towns, schools and utilities could be release so the public would learn of the problem,
These high radon levels and the risk health risk presented were widely publicized.

80.     Defendant Armstrong and Defendant Doe(s) 1 to 3 ignored such triggering event and
Failed to test for indoor radon at Garner in 1996 to the detriment of the plaintiff.

81.     As of October 1997, the federal Environmental Protection Agency's Office of Indoor Air
And Radiation had issued a publication entitled "An Office Building Occupant's Guide to Indoor
Air Quality" that was intended, amount other things, to encourage those in facilities management,
Such as Defendants Link and Batten, to develop preventive indoor air quality management
Programs following guidance from EPA and the National Institute for Occupational Safety and
Health (NIOSH).

82.     Given that such indoor air quality management programs were intended to address conditions faced by those occupants that spend extended time indoors such as a full workday, defendants should have been cognizant that these same principles applied to inmates housed at Garner in a closed indoor ventilation system for up to 24 hours per day, seven days per week, many of whom resided in these conditions for many months or years.

83.     Had Defendants Semple, Dzurenda, Arnone, Lantz, Armstrong, Link, Batten and Doe(s) 1 to 3 applied such guidelines to the issue of the indoor air quality at Garner, the high levels of Radon could have been detected many years earlier and exposure to such levels of radon Posing significant health risks would have been avoided for staff and inmates alike.

84.     Correctional and medical staff (first DOC employees and later designated employees of the University of Connecticut Health Center Correctional Managed Care (CMHC) who worked in the medical, mental health and dental areas at Garner Correctional Institution that are below ground level regularly and routinely throughout the years beginning shortly after Garner opened complained about the indoor air quality, including issues of mold, water and mildew. Had defendants Semple, Dzurenda, Arnone, Lantz, Armstrong, Meachum, Link, Batten, and Doe(s) I to 3 properly and thoroughly investigated such complaints over the years in accordance with recommended EPA and NIOSH guidelines, the high levels of radon that posed significant health risks to staff and inmates alike would have been detected and mitigated years earlier.

85.     In November 2000, Newtown public officials had the drinking water at its town schools Tested for the presence of uranium. In late January 2001, the test results for Middle Gate School were publicly released, revealing an elevated level of uranium in the school's drinking water of 211 pCi/L, approximately eight times greater than the EPA guideline of 27 pCi/L for allowable Uranium in drinking water. Middle Gate School thereafter made bottled water available as its sole drinking source.

86.     Notably, Middle Gate School was the only Newtown school at those times to share its water supply with Garner Correctional Institution. In its January 2003 updated to its Community Facilities Plan of Conservation and Development (Plan Memorandum #10), Newtown was to Improve the Middle Gate School by connecting it to the United Water Connecticut's water system so, it was no longer dependent upon the well system it had previously shared with Garner

16

Correctional Institution that had tested high for both radon and uranium in the drinking water.

87.     Defendants Armstrong, Batten and Doe(s) 1 to 3 again ignored such triggering events and Failed to test for indoor radon or uranium/radon in the water supply at Garner from November 2000 January 2003 to the detriment of the members of the correctional institution.

88.     Notably, at approximately the same time that high uranium levels in the water supply at Middle Gate School were revealed, those defendants in charge at that time closed the water supply for Garner, falsely claiming that an animal had gotten into the well.  Because the cover on the well could not possibly have been moved by an animal native to that area due to its significant weight and size, defendants were recklessly, intentionally and willfully hiding that the water supply, including that used for drinking and cooking, posed a health risk.

89.     For a short period at that time, defendants in charge shut off the water supply, issuing bottled water for consumption, providing cold meals that did not require water for cooking, and prohibiting showers by inmates.

90.     Defendant Semple was well known by correctional and medical staff affirmatively to State that he never drank the water from Garners well.

91.     At the direction of Defendant Batten, DOC Director of Engineering and Facilities, an Informational column published in the September 10-23, 2006 issue of the Department of Correction's periodic newsletter P.R.I.D.E at Work discussed indoor radon gas, including its Identification as the second leading cause of lung cancer in the United States, the significant Health risk imposed by breathing it over prolonged period.

92.     Although defendant Batten recognized that radon could enter through the cracks in the foundation or through well water, thereafter, trapping this hazardous gas inside dwellings, he failed to ensure during his tenure as Correction's Director of Engineering and Facilities that indoor radon testing occurs at Garner, which houses inmates within a closed ventilation system in an area identified by the EPA as having high concentration of radon gas likely in excess of 4.0 piC/L, its action level for remediation.

93.     The high levels of radon found at Garner as a result of testing first in December 2013 and thereafter in January 2014 were thus entirely preventable; and would have been prevented years earlier but for the acts and omissions of the Defendants.

17

**Impact of the presence of a school at Garner**

94.     Radon testing of Garner's school classrooms in late 2013 and early 2014 was triggered by the Request of a teacher with DOC Unified School District # 1 who demanded in the Spring/Summer of 2013 that the school area be tested specifically for radon in accordance with Connecticut General Statutes 10-220(d)(2); had this teacher not demanded statutory compliance for radon testing at the public school, no radon testing at Garner would have occurred and it is highly probable the inmates would could continue to be exposed to the harmful effects of radon to tis date.

95.     As early as 1971, under the leadership of Commissioner John Manson (1971-1983), Connecticut Department of Correction became the second in the country to organize the Educational system into a unified school district, designated by the state as Unified School District # 1.

96.     Garner's educational offerings included completion of a high school diploma and special education services for those inmates entitled by law to public education through their twenty-first birthday under the Individuals with Disabilities Education Act (IDEA).

97.     The Student and Parent/Guardian Handbook of Unified School District #1, Connecticut Department of Corrections provides notice under the heading "Asbestos" that "(l)egislation Requires all school buildings to be reevaluated to determine if asbestos is present and if it poses a significant health hazard to the building's occupants. The Department of Correction meets or exceeds these OSHA standards.

98.     Connecticut General Statues 19a-333 entitled "Regulations re asbestos-containing materials in schools" provides in relevant part that "(t)he Department of Public Health shall adopt regulations in accordance with the provisions of chapter 54 which shall meet or exceed the requirements mandated by the United States Environmental Protection Agency standard for asbestos-containing materials in schools in accordance with the federal regulations as from time to time amended."

99.     Although the presence of a school on site required to provide inmates eligible under the IDEA with a free public education at Garner should have also triggered the legal obligations established for radon in schools, just as Unified District # 1 complied with legal directives on asbestos, Defendants failed to comply with these state dictates.

18

100.    Connecticut General Statues 19a-37b, which went into effect in 1990 prior to Garner's construction, required the state Department of Public Health to adopt regulations to establish radon measurement requirements and procedures to reduce elevated radon levels in public schools.

101.    Connecticut General Statues 10-203, since its amendment in 1996, has required each local and regional board of education to maintain its facilities in accordance with applicable public health statues and regulations.

102.    Since 2003, Connecticut has required indoor air quality testing in its public schools using EPA protocols that include testing for radon pursuant to Connecticut General Statues 10-220(d)(2).

103.    Pursuant to General Statutes 10-220 (d) (7) and (14), Connecticut has also required since 2003 making radon test results and plans for mitigation available for public inspection, including on a school Board's or school's website.

104.    Since 2003, Connecticut General Statues 10-291 provides that the state Department of Education cannot approve a school building project or plan located in EPA Zone 1, the same EPA designated zone in which Garner was constructed, unless project plan incorporates techniques to mitigate radon levels in air of facility.

105.    The passage in 2003 of this comprehensive state legislative structure to address the substantive health risk of radon to children attending school again provided, at a minimum, triggering evens such that defendants Lantz, Batten and Doe(s) 1 to 3 should have tested for radon in Garner's classrooms

106.    On June 30, 2003, Defendant Lantz publicized the Department of Correction's fiscal Stewardship as any agency accomplishment when it returned $9,333,754 to the Connecticut's General Fund at the conclusion of fiscal year 2002-2003, highlighting "that the Department is especially proud of its prudent fiscal management at a time when state government overall is battling ever tightening budgetary constraints." Had indoor radon testing been conducted at Garner in 2003, the cost of installing a mitigation system preventing any future harmful radon Exposure would likely have been significantly less than the $60,000 paid in 2014.

107.    Ongoing compliance with these directives on indoor radon at schools would have alerted Defendants Semple, Dzurenda, Arnone, Falcone, Link and Doe(s) 1 to 3 of the need to test for radon in Garner's classrooms, the very testing location in 2012 and again in December 2013 that

revealed indoor radon levels in excess of EPA's action level of 4.0 piC/L.

108.    By first failing to include a radon mitigation in Garner's design, and thereafter failing to test for indoor radon, despite numerous legislative prompts and environmental evens in Newtown revealing high levels of radon and uranium in the underground water supply shared With Garner that should triggered indoor radon testing over the years, the acts and omissions of Defendants constitute deliberate indifference and reckless disregard to the toxic conditions of confinement to which plaintiff, and those similarly situated, were subjected.

109.    Defendants knew that inmates housed at Garner from its inception until the installation of the radon mitigation system in October 2014 faced substantial risk of serious harm from indoor radon exposure, and disregarded that risk by failing to take reasonable measures to abate it.

110.    Although two inmates have a confirmed diagnosis of lung cancer, future risk can suffice To constitute a substantial risk of serious harm, even if an inmate experiences no present systems And there are a number of former employees who suffer from lung cancer and lung disease, Including four known employee deaths from lung cancer.

111.    The World Health Organization has urged that countries adopt an action level of 2.7 pCi/L because 4.0 pCi/L is the equivalent of smoking 8 cigarettes a day: exposure to indoor radon at 10.0 pCi/L is equivalent to smoking more than 1 pack of cigarettes a day: and exposure to indoor radon at 20.0 pCi/L is equivalent to smoking more than 2 ½ packs of cigarettes a day.

**Radon testing results**

112.    Indoor radon exposure at Garner depending on location (and housing units were intentionally not tested) equates to smoking from ten (10) cigarettes a day (5.0pCi/L) to more than two and one half (2 ½) packs of cigarettes a day (23.7 pCi/L).

113.    When state mandated testing of Garner's frequently occupied school rooms was conducted In December 2013 at the demand of a Garner teacher, the Connecticut Department of Public Health, Environmental Health Section – Radon Program distributed a letter for notification purposes of the Radon testing event to all Garner staff (both DOC and CMHC). By intention and reckless disregard Of their statutory and constitutional obligations to ensure that the conditions of confinement were Safe and did not provide exposure to known toxic carcinogens, no inmates at Garner were ever

Informed that radon in the air testing was being conducted.

114.     Defendants Semple, Dzurenda, Falcone, Link and Doe(s) 1 to 3 made a deliberate and conscious choice, after having been informed of the need for follow-up testing over and expanded area beyond the classroom at Garner initially tested, that the cell blocks housing inmates would not be tested because pursuant to Connecticut Department of Public Health, Environmental Health Section – Radon Programs protocol, inmates would have to be notified in Writing of the radon testing event.

115.     On January 27, 2014, Allison Perry Sullivan, an Environmental Analyst with the Connecticut Department of Public Health, Environmental Health Section- Radon Program, sent A detailed letter to Richard Pease, the Environmental Analyst for the Connecticut Department of Correction under its Division of Engineering and Facilities Management, setting forth the results from the radon in air testing performed at Garner, initially from December 11-17, 2013 and thereafter from January 13-16, 2014.

116.     Although that January 27, 2014 letter closed with the state Department of Public Health's Stated desire "to assist (DOC) in the radon testing efforts to promote a health environment for GCI **residents** and staff, "Defendants Semple, Dzurenda, Falcone, Link and Doe(s) 1 to 3 failed to Inform inmates at Garner of the high levels of radon found, many of which were multiples of the EPA action level of 4.0 piC/L, including some areas producing an average test result in excess of 20.0 piC/L.

117.     As reported by Connecticut's Department of Correction in 2011, the overall cost per Inmate for medical, mental health and dental services was $4,780, the per inmate health cost at Garner Correctional Institution was significantly higher, approximately $12,000 in significant part due to the Department of Correction's decision to concentrate inmates with substantive mental health problems there.

118.     The medical, mental health and dental sections of Garner had significantly higher radon Levels than other sections tested that also demonstrated levels above EPA action level of 4.0 pCi/L, many of which were several multiples of the EPA action level.

119.     On March 13, 2014 Defendant Falcone thereafter informed DOC staff, through Roll Call, (which Roll Call notice CMHC also utilized to inform Garner medical staff) of the elevated

21

Indoor radon testing results, necessitating remediation.

120.    Although Defendants Semple, Dzurenda, Falcone, Link and Doe(s) 1 to 3 considered it Necessary to inform DOC staff on March 13, 2014, they intentionally, willfully and recklessly failed to inform inmates residing at Garner or who had previously resided at Garner of this "emergency" situation, whom, of their 24/7 incarceration, had significantly longer exposure to the high radon levels than any DOC staff member.

121.    Although as of March 13, 2014, Defendants Semple, Dzurenda, Falcone, Link and Doe(s) 1 to 3 had made the complete report of radon testing results available in the Human Resources Office for review by DOC staff, they intentionally, willfully and recklessly failed to make such Indoor radon testing report available to inmates residing at Garner, or to any inmate who had Previously resided at Garner, despite Defendant Falcone's claim in that same March 13, 2014 Roll Call notice that "(DOC) are committed to the health and safety of our inmates . . ."

122.    On March 14, 2014, Richard Bush, Health Services Administrator 2 of UCONN Health Corrections Managed Health Care Central Office, sent an email to CMHC employees at Garner, which in addition to attaching Defendant Falcone's March 13th Roll Call, stated, as part of the list of initiatives/actions that have been taken or are pending concerning the high levels of radon found at Garner, that "DOC staff are having their employee's complete WC (Workers Compensation) paperwork. I will be reviewing this with CMHC Central Office and HR. It's very likely that we will follow DOC's lead on this."

123.    On March 21, 2014, Richard Bush sent an email to CHMC employees at Garner entitled "Radon update - WC claims;" that email stated, after speaking with the Department of Administrative Services representative who is coordinating the best way to file the claims for both DOC and CMHC, **"(t)hey are looking at creating a mechanism with the WC carrier to mass file the WC 207 Forms for both Agencies.**

124.    On May 2, 2014, in a message to Roll Call at Garner – Deputy Warden Denise Dilworth Informed DOC staff that Defendant Link "has received the draft remediation design for Garner and (is) reviewing it and corresponding with the consultant with comments/questions. currently, it is not ready for bidding however they are working as fast as possible to bring it to that point . . . . They will expedite all phases as much as possible while making sure we get a good

product/project." The information however was not shared with Garner's inmates.

125.    In its May 8, 2014 to June 13, 2014 issue of P.R.I.D.E at Work, Defendants Semple, Dzurenda, Falcone, Link and Doe(s) 1 to 3 disclosed to correctional employees the need for Radon Mitigation at Garner Correctional Institution, but failed to disclose such elevated indoor Radon levels requiring remediation to inmates housed at Garner.

126.    That newsletter issue further revealed to correctional employees, but not inmates housed at Garner, that a complete report of the radon testing results is available for review in Garner's Administrative Office (Room 104). At no time did Defendants Semple, Dzurenda, Falcone, Link And Doe(s) 1 to 3 make such complete report available to inmates housed at Garner for their review.

127.    The same newsletter further revealed to DOC employees, but not plaintiff or those similarly situated, that is other inmates housed at Garner at that time or who had been incarcerated at Garner in the past but were now housed at a different DOC facility, that DOC employees had the ability to complete a WC 207 package in order to preserve their right to workers' compensation benefits in the future should they have or develop a medical condition linked to indoor radon exposure above the EPA action level of 4.0 pCi/L (picocuries per liter of air)

128.    In permitting its employees to file a workers' compensation notice of injury of exposure to high levels of indoor radon gas, without any limitations on length of exposure, Defendants Semple, Dzurenda, Falcone, Link and Doe(s) 1 to 3 have established both as a matter of fact and law that a serious risk to health or future exist due to indoor radon exposure.

129.    In its October 11, 2014 to November 21, 2014 issue of P.R.I.D.E at Work, Defendants Semple, Falcone, Link and Doe(s) 1 to 3 disclosed the following: "The need for the mitigation systems were discovered earlier this year when, after the completion of federally mandated radon testing of schools throughout the department, radon levels above the action level of 4 picocurie/ liter was found at Garner CI. Current Environmental Protection Agency guidelines suggest that action be taken if the radon level in any occupied part of a building reaches or exceeds 4 pCi/L. Radon is measured in picocuries per liter of air (pCi/L.) To better understand the relative amounts to which a person may be exposed, the average indoor level is 1.3 pCi/L, and about 4.0 pCi/L is normally found in the outside air.

130.    That same newsletter also disclosed that "(a)s a result of the testing, the Department of

Correction (DOC) in conjunction with the Department of Public Health (DPH) initiated an

**emergency** radon remediation project. An environmental consultant was hired to evaluate the

situation and develop an action plan. Two licensed radon remediation contractors with

experience in large facility remediation were invited to design and bid on a system to lower the

radon levels. The system designs were evaluated by an environmental consultant along with staff

members from the DOC's Facilities Management and Engineering Unit. They settled on a design

consisting of six Active Soil Depressurization Systems unit.

131.    Defendants Semple, Falcone, Link and Doe(s) 1 to 3 recklessly, intentionally and

willfully, in violation of the statutory authority and constitutional obligations, withheld such

information from inmates housed at Garner.

132.    Under state law, the Department of Correction is tasked with establishing a public safety

Committee in each municipality in which a correctional facility is located.  The (DOC/Garner)

Public Safety Committee meets quarterly to review correctional safety and security issues that

Affect Newtown.

133.    The Public Safety Committee (DOC/Garner) Minutes on March 4, 2014 reveal in

Relevant part that defendant Warden Falcone informed Newtown public officials that

'(t)he facility tested high for radon last year and again even higher this year. They will work

toward rectifying this problem."

134.    The Public Safety Committee (DOC/Garner) Minutes on December 2, 2014 reveal in

Relevant part that defendant Warden Falcone updated Newtown public officials and others

Present on the radon mitigation system installed at Garner Correctional Institution and that

further testing would take place when the ground freeze to ensure that indoor radon levels were

safe.

135.    Although defendant Warden Falcone considered it prudent to inform Newtown public

Officials and other members of the Public Safety Committee about testing results from December

2013 and January 2014 that revealed high levels of radon and the installation of the new radon

Mitigation system to alleviate this problem, at no time did defendant Falcone inform those

Inmates incarcerated at Garner about the high levels of indoor radon, a known carcinogen, to

Which they were exposed, and the installation of a radon mitigation system to bring indoor radon

Levels under the EPA action level.

136.    In sharp contrast to the actions and omissions of these defendants, and with careful regard for its statutory and constitutional obligations, the Colorado Department of Corrections, when confronted with a comparable toxic exposure situation, high levels of uranium in the water supply in excess of the EPA standard at is Sterling correctional facility, and the concerned about the health risk to both its and inmate population, through its Warden explained the situation to inmates and staff alike and responded to inmate concerns and questions about uranium exposure. As an extra measure to protect the health of staff and inmate population, the Colorado Department of Corrections supplied outside drinking water to reduce uranium exposure until the water supply could be fixed.

### Count 1 – Federal Constitutional Violations

1 to 136.    Plaintiffs incorporate by reference Paragraphs 1 through 136 above, as if more Fully set forth herein.

137.    For all named plaintiffs and class members housed at Garner Correctional Institution post-conviction, the practices, policies, acts and omissions alleged in this Complaint that exposed them to indoor radon gas are in violation of the Eight Amendment to the United States Constitution in that they deprived them of their right to be free from cruel and unusual punishment.

138.    Although the Eighth Amendment to the United States Constitution does not apply to pre-trail detainees, the due process clause of the Fourteenth Amendment to the United States Constitution provides to pre-trial detainees at least equal protection to that accorded convicted prisoners.

139.    For those class members housed at Garner Correctional Institution as pre-trail detainees, the practices, policies, acts and omissions alleged in this Complaint that exposed them to indoor radon gas are in violation of the Fourteenth Amendment to the United States Constitution in that they deprived them of their right to be free from deprivations of liberty without due process of law.

140.    Until such time as the housing units are tested for indoor radon gas, although the installation of the radon mitigation system at Garden Correctional Institution completed on October 10, 2014 may have corrected the unconstitutional conditions of confinement, the harms suffered by post-conviction plaintiffs and post-conviction members of the plaintiff class from their

25

exposure to such unconstitutional conditions of confinement prior to that date caused irreparable physical harm from prolonged exposure to a known carcinogen.

141.    Until such time as the housing units are tested for indoor radon gas, although the Installation of the radon mitigation system at Garner Correctional Institution completed on October 10, 2014 may have alleviated the due process violations, the harms suffered by pre-trial Plaintiffs and pre-trial members of the plaintiff class from their exposure to such unconstitutional Conditions of confinement prior to that date caused irreparable physical harm from prolonged Exposure to a known carcinogen.

142.    By virtue of their deliberate and reckless indifference to the serious health risks Associated with indoor radon exposure, including their reckless, willful and intentional refusal to provide medical monitoring and management to those post-conviction plaintiffs and class members who have not yet exhibited a medical condition associated with radon exposure, Defendants Semple, Dzurenda and Falcone, all of whom had actual knowledge of the December 2013 and January 2014 test result revealing high levels of indoor radon gas, as well as the other Defendants who recklessly and intentionally ignored triggering evens to test for radon, violated The Eighth Amendment to the United States Constitution as determined under Estelle v. Gamble, 429 U.S. 97 (1976).

143.    By virtue of their deliberate indifference to the serous health risks associated with indoor Radon exposure, including their intentional refusal to provide medical monitoring and management to those pre-trial plaintiffs and class members who have not yet exhibited a medical condition associated with radon exposure, Defendants Semple, Dzurenda and Falcone, all of whom had actual knowledge of the December 2013 and January 2014 test results revealing high levels of indoor radon gas, as well as the other defendants who recklessly and intentionally ignored triggering events to test for radon, violated the Fourteenth Amendment to the United States Constitution by deprivation of liberty without due process of law as applied under Estelle v. Gamble, 429 U.S. 97 (1976).

144.    By recklessly, intentionally and willfully depriving the plaintiffs and members of the Plaintiff class of notice as to the indoor radon testing results and installation thereafter of a radon Mitigation system, Defendants Semple, Dzurenda and Falcone exceeded their statutory authority as well as their state and federal constitutional obligations to provide open access to the courts by

26

depriving plaintiffs and members of the plaintiff class of the condition precedent to court access: the opportunity to file a timely grievance, thereafter, exhaust their administrative remedies, and file a claim for injury with the Claims Commissioner pursuant to Public Act 16-127 & 23.

### Count II – State Law Claims

1 to 144.         Plaintiffs incorporate by reference Paragraphs 1 through 144 of the First Count as if more fully set forth herein.

145.         For all named plaintiffs and class members housed at Garner Correctional Institution post-conviction, the practices, polices, acts and omissions alleged in this Complaint are in violation of Connecticut Constitution, Article First, Section 8 in that they deprived them of their right to be free from cruel and unusual punishment.

146.         For those class members housed at Garner Correctional Institution as pre-trial detainees, the practices, policies, acts and omissions alleged in this Complaint are in violation of Connecticut Constitution, Article First, Section 8 in that they deprived them of their right to be free from deprivations of liberty without due process of law.

147.         Until such time as the housing units are tested for radon, although the installation of the radon mitigation system at Garner Correctional Institution completed on October 10, 2014 may have corrected the unconstitutional conditions of confinement, the harms suffered by post-conviction plaintiffs and post-conviction members of the plaintiff class from their exposure to such unconstitutional conditions of confinement prior to that date caused irreparable physical harm from prolonged exposure to a known carcinogen.

148.         Until such time as the housing units are tested for radon, although the installation of the radon mitigation system at Garner Correctional Institution completed on October 10, 2014 may have corrected the unconstitutional conditions of confinement, the harms suffered by pre-trial plaintiff and pre-trial members of the plaintiff class from their exposure to such unconstitutional conditions of confinement prior to that date caused irreparable physical harm from prolonged exposure to a known carcinogen.

149.         By virtue of their deliberate indifference to the serous health risks associated with indoor radon exposure, including their intentional refusal to provide medical monitoring and management to those post-conviction plaintiffs and class members who have not yet exhibited a medical

condition associated with radon exposure, Defendants Semple, Dzurenda and Falcone, all

whom had actual knowledge of the December 2013 and January 2014 test results revealing high

levels of indoor radon gas, as well as the other defendants who recklessly and intentionally ignored

triggering evens to test for radon, violated Connecticut Constitution, Article First, Section 8.

150.    By recklessly, intentionally and willfully depriving the plaintiffs and members of the

Plaintiff class of notice as to the indoor radon testing results and installation thereafter of a radon

Mitigation system, Defendants Semple, Dzurenda and Falcone exceeded their statutory authority

as well as their state and federal constitutional obligations to provide open access to the courts by

depriving plaintiffs and members of the plaintiff class of the condition precedent to court access:

the opportunity to file a timely grievance, thereafter, exhaust their administrative remedies, and

file a claim for injury with the Claims Commissioner pursuant to Public Act 16-127 & 23. Such

actions and omissions violated Connecticut Constitution, Article First, Section 10.


### Claims for Relief

Wherefore, plaintiff request the following relief:

1.    For the named plaintiffs and the members of the plaintiff class, a declaratory judgement

that the acts and omissions of the Defendants violate the constitutional rights under both

the U.S. and Connecticut Constitutions respectively as well as violate federal and state law.

2.    Written, verifiable notice to all members of the plaintiff class, with the cost of such

Notice borne by the defendants:

3.    For the named plaintiffs and members of the plaintiff class, injunctive relief by way of

Comprehensive radon testing over time in all areas that house inmates and the procurement of

any mitigation system deemed necessary as an emergency expenditure if test results deem the

current system inadequate.

4.    For the named plaintiffs and members of the plaintiff class, injunctive relief by way of

comprehensive baseline medical examination of all class members – including either a chest

X-ray or pulmonary CAT Scan, the determination of which shall be made by a medical provider

Knowledgeable about radon toxicity and based on that class member's individual health history.

5.    For the named plaintiffs and members of the plaintiff class, injunctive relief by way of

Medical monitoring, including but not limited to periodic comprehensive physical examinations, and updated chest X-rays and/or a pulmonary CAT Scan, the determination of which shall be made by a medical provider knowledgeable about radon toxicity and based on that class member's individual health history.

6.   For the named plaintiffs and members of the plaintiff class, injunctive relief by way of follow-up health care treatment for all diagnosed medical conditions as have been previously identified, or may in the future be identified, with exposure to radon by one more of these entities: the federal Environmental Protection Agency; the National Research Council of the National Academy of Sciences; the National Cancer Institute; the American Medical Association. the World Health Organization. At this time, those medical conditions include lung cancer and chronic, nonmalignant lung diseases such as chronic obstructive pulmonary disease (COPD), emphysema, chronic interstitial pneumonia and pulmonary fibrosis.

7.   Noneconomic monetary damages payable by the defendants in their individual capacities For all class members already diagnosed, or who in the future are diagnosed with medical Conditions as have been previously identified, or may in the future be identified, which exception to radon. At this time, those medical conditions include lung cancer and chronic, nonmalignant lung diseases such as chronic obstructive pulmonary disease (COPD), emphysema, chronic interstitial pneumonia, pulmonary fibrosis. Additionally, damages for lost wages, earning capacity and punitive damages if permitted.

8.   Non-economic monetary damages payable by defendants Semple, Dzurenda and Falcone In their individual capacities for recklessly, willfully and intentionally denying all class members Their rights to access the courts.

9.   Compensatory damages by defendants in their individual capacity to the named plaintiffs for standing in the place of the member class for purposes of this litigation.

10.  Reasonable attorney's fees and cost.

11.  Such other relief as the Court may deem just and proper.

Undersigned swears to the truth of the allegations under pains of perjury.

RESPECTFULLY SUBMITTED, this 16th day of November 2020.

Plaintiff,

Kenny R. Holley Jr

Inmate # 337307

Cheshire Correctional Institution

900 Highland Avenue

Cheshire, Connecticut 06410

30